

**U.S. Department of Justice**

*United States Attorney*
*Southern District of New York*

---

*The Jacob K. Javits Federal Building*
*26 Federal Plaza, 37th Floor*
*New York, New York 10278*

July 16, 2025

**BY ECF**
The Honorable Dale E. Ho
United States District Judge
Southern District of New York
40 Foley Square
New York, New York 10007

   Re: *United States v. Maxwell Paul*, 25 Cr. 113 (DEH)

Dear Judge Ho:

  The Government respectfully submits this letter in advance of the sentencing of defendant Maxwell Paul, scheduled for July 23, 2025. For the reasons set forth below, the Government submits that a term of imprisonment of 108 months' imprisonment—consistent with the recommendation of the United States Probation Office for the Southern District of New York ("Probation")—is sufficient but not greater than necessary to serve the legitimate purposes of sentencing.

  **A. Factual Background**

  In November 2024, the defendant sold roughly 25,000 fentanyl pills to a confidential source (the "CS") working at the direction of the Drug Enforcement Administration (the "DEA"). (Presentence Investigation Report ("PSR") ¶¶ 9-14). That controlled buy—which involved discussions of the defendant promising to sell 100,000 more pills to the CS in the near future—led to the seizure of a loaded firearm and even more dangerous drugs from the defendant's apartment, including over a kilogram of heroin and hundreds more fentanyl pills. (PSR ¶ 14).

  On November 13, 2024, the CS contacted the defendant, who was calling himself "Luis" in conversations with the CS, by phone. (PSR ¶ 10). During several recorded conversations between the defendant and the CS, the defendant agreed to sell the CS approximately 25,000 fentanyl pills for $137,500 and agreed to meet the CS in the vicinity of a shopping center in the Bronx, New York, later that afternoon. (PSR ¶ 10). The CS discussed with the defendant a plan to sell the fentanyl at a music concert featuring a well-known artist who is popular with teenagers and young adults that was taking place in another country later that month. (PSR ¶ 10). The defendant also told the CS that he could sell the CS an additional 100,000 pills in approximately five days. (PSR ¶ 10). The defendant appears to have been attempting to coordinate the sale while transporting his father-in-law to chemotherapy treatment. (PSR ¶ 10). For instance, the defendant initially offered to meet the CS in the parking lot of his father-in-law's clinic. (PSR ¶ 10).

Law enforcement subsequently began conducting surveillance in the vicinity of the shopping center where the defendant and the CS had agreed to meet. (PSR ¶ 11). There, law enforcement observed the defendant arrive in a vehicle, which parked in the parking lot of the shopping center. (PSR ¶ 11). Law enforcement then saw the defendant exit his vehicle and enter the rear passenger side of the CS's car, which was parked in the same lot. (PSR ¶ 11).

While the defendant and the CS were in the CS's car, the defendant showed the CS a small plastic bag containing small blue pills and allowed the CS to inspect the pills. (PSR ¶ 12). During that initial meeting, the defendant and the CS discussed the color of the pills and their strength, and the CS confirmed that he intended to sell the pills at a concert in another country. (PSR ¶ 12). After the CS confirmed that he would accept the pills, the defendant exited the CS's car, returned to his own vehicle, removed a green cooler from the trunk, and returned to the CS's car. (PSR ¶ 12). Once inside, the defendant provided the CS with the green cooler and showed the CS the cooler's contents, which consisted of several additional large clear bags containing small blue pills. (PSR ¶ 12). In total, the packages appeared to contain approximately 25,000 pills. (PSR ¶ 12). After the defendant handed the CS the green cooler, law enforcement officers approached the defendant while he was still seated in the CS's car and arrested him. (PSR ¶ 12). The pills from the green cooler subsequently field-tested positive for fentanyl and were found to weigh 2.6 kilograms. (PSR ¶ 13).

Following his arrest, the defendant disclosed to law enforcement that he had additional contraband in his apartment and consented to a search of his apartment, where he resided with his wife and at least one child. (PSR ¶ 14). During the ensuing search, law enforcement recovered a zip-lock bag containing approximately 978 grams of black tar heroin, approximately 413 additional fentanyl pills similar in appearance to those sold by the defendant to the CS, and approximately 141 grams of powder heroin. (PSR ¶ 14). Law enforcement also recovered a .40 caliber Glock 27 pistol with approximately 20 rounds of ammunition and an extended magazine. (PSR ¶ 14).

As to the total weight of the drugs involved in this case, the defendant is being held accountable for conspiring to distribute and possess with intent to distribute 2.6 kilograms of fentanyl and 1.12 kilograms of heroin. (PSR ¶ 15).

### B. Procedural History and Guidelines Calculation

On November 14, 2024, the defendant was charged by complaint with distribution of narcotics, in violation of 21 U.S.C. § 841(b)(1)(A). (Dkt. 1). The same day, the defendant was presented before the Honorable Ona T. Wang, United States Magistrate Judge, and ordered detained. (Dkt. 3).

On March 19, 2025, in a proceeding before this Court, the defendant waived indictment and consented to the filing of an information (the "Information") charging him with: (i) conspiracy to distribute and possess with intent to distribute 400 grams and more of fentanyl and one kilogram and more of heroin, in violation of 21 U.S.C. §§ 846 and 841(b)(1)(A) (Count One); and (ii) using, carrying, and possessing a firearm in furtherance of that drug trafficking crime, in violation of 18 U.S.C. §§ 924(c)(1)(A)(i) and 2 (Count Two). (Dkt. 13-15). At the same proceeding, the defendant pleaded guilty to both counts charged in the Information, pursuant to a plea agreement between the parties.

In the plea agreement, the parties stipulated that the Guidelines range applicable in this case is 87 to 108 months' imprisonment, with a mandatory minimum term of 60 months' imprisonment as to the defendant's conviction on Count Two. (PSR ¶ 6).  Probation concurs with the parties' Guidelines calculations and recommends a sentence of 108 months' imprisonment, comprised of 48 months of imprisonment on the defendant's conviction on Count One and the mandatory-minimum term of 60 months' imprisonment on the defendant's conviction on Count Two. (PSR at 21-22).  The defense requests a sentence of 60 months' imprisonment—*i.e.*, just the mandatory-minimum term of imprisonment required with respect to Count Two. (Dkt. 22 ("Def. Br." at 1).

### C.  Discussion

#### 1.  Applicable Law

The Guidelines are "the product of careful study based on extensive empirical evidence derived from the review of thousands of individual sentencing decisions," *Gall v. United States*, 552 U.S. 38, 46 (2007), and district courts are required to treat them as the "starting point and the initial benchmark" in sentencing proceedings, *id.* at 49.

After calculating the Guidelines, the Court must consider seven factors: (1) "the nature and circumstances of the offense and the history and characteristics of the defendant," (2) the purposes of sentencing discussed in the next paragraph, (3) "the kinds of sentences available," (4) the Guidelines range itself, (5) any relevant policy statements by the Sentencing Commission, (6) "the need to avoid unwarranted sentence disparities among defendants," and (7) "the need to provide restitution to any victims."  18 U.S.C. § 3553(a)(1)-(7); *see also Gall*, 552 U.S. at 49-50 & n.6.

In determining the appropriate sentence, Section 3553(a) directs judges to "impose a sentence sufficient, but not greater than necessary, to comply with the purposes" of sentencing, which are:

(A)   to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
(B)   to afford adequate deterrence for criminal conduct;
(C)   to protect the public from further crimes of the defendant; and
(D)   to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner.

18 U.S.C. § 3553(a)(2).

#### 2.  A Sentence of 108 Months' Imprisonment is Appropriate

The Government submits that a sentence of 108 months' imprisonment—the same one recommended by Probation—is warranted in this case, with the key factors here being the need for the sentence to capture the seriousness of the defendant's offenses, protect the public, and promote deterrence.

*First*, a significant term of imprisonment in line with the Government's recommendation is necessary to reflect the seriousness of the defendant's offenses and provide just punishment for those crimes.

The defendant trafficked extremely dangerous drugs: fentanyl and heroin. The dangers of those particular drugs are well established. Their injection into the community through conduct like the defendant's gives rise to addiction, violence, and death. For those reasons, major drug crimes—and particularly the distribution of fentanyl and heroin—are among "the most serious" offenses proscribed by federal law. *United States v. Dillard*, 214 F.3d 88, 101 (2d Cir. 2000); *see also United States v. Qayyem*, No. 10 Cr. 19 (KMW), 2012 WL 92287, at *4 (S.D.N.Y. Jan. 11, 2012) (describing study in preeminent medical journal in which cocaine was found to have "second-highest mean harm score of all twenty drugs [under study], after heroin"). As the Court is aware, fentanyl is a particularly dangerous substance, even small amounts of which can prove to be fatal. Indeed, according to the Centers for Disease Control and Prevention (the "CDC"), out of over 107,000 deaths from drug overdoses in 2022, it is estimated that 80,590 of these deaths, or 75%, involved at least one opioid, with 71,450, or 66.5%, involving synthetic opioids, primarily from fentanyl or fentanyl analogues.[1] In 2023, for the first time in U.S. history, the overdose death rate topped 112,000 in a 12-month period, according to the CDC, with young people and people of color among the hardest hit.[2] Drug policy experts and people living with addiction say the magnitude of this calamity now eclipses every previous drug epidemic, from crack cocaine in the 1980s to the prescription opioid crisis of the 2000s.[3]

The quantities of these drugs yield a high Guidelines range here, but for good reason. The defendant dealt—or was prepared to deal—large quantities of these dangerous drugs, selling 25,000 fentanyl pills to the CS on just one occasion. He had another stash at home, ready for other customers—customers who, unlike the CS, were not intending to turn the drugs over to law enforcement where they could not hurt the surrounding community. On just a single day, the defendant was not only able to procure 25,000 pills but also retained, at his home, over a kilogram of heroin and hundreds more pills. The defendant's access to and willingness to procure large reserves of these dangerous drugs undercuts the notion that the defendant was a smalltime drug dealer looking to make a quick buck so that his family could get by. (*See* Def. Br. at 5-6). To the contrary, the defendant was looking to rake in hundreds of thousands of dollars, and he was dealing drugs in quantities that would see him enjoy that kind of money, not a mere $10,000 or $12,000 to

---

[1] *See* CDC, Fighting Fentanyl: The Federal Response to a Growing Crisis, July 26, 2022 (statement of Christopher M. Jones, Acting Director of National Center for Injury Prevention and Control, CDC), *available at* https://www.cdc.gov/washington/testimony/2022/t20220726.htm#:~:text= Together%20we%20can%20stop%20drug,months%20ending%20in%20January%202022; *see also United States v. Herrera*, No. 21 Cr. 750 (LJL), 2023 WL 3862695, at *1 (S.D.N.Y. June 7, 2023) ("[Fentanyl] can be extraordinarily dangerous and is lethal. In 2020, the National Institutes of Health reported that synthetic opioids, primarily fentanyl, caused the most drug overdose deaths in the United States, with approximately 56,516 such deaths documented that year. Fentanyl can "wreak[] havoc on entire communities . . . [and] destroy[] lives.").

[2] https://www.npr.org/2023/12/28/1220881380/overdose-fentanyl-drugs-addiction#:~:text=In%2 02023%20the%20overdose%20death,for%20Disease%20Control%20and%20Prevention.

[3] *Id.*

pay off gambling debt, (*see* Def. Br. at 6). Indeed, to that point, unlike many other defendants convicted of drug offenses, the defendant (and his wife) were gainfully employed, albeit in what the defense describes as low-earning jobs. (*See* Def. Br. at 6). As the defendant candidly put it, it was "greed" that motivated his conduct here. (PSR ¶ 18; Def. Br. at 6).

The defendant placed his greed upon the health and lives of other people. He was willing to sell 25,000 pills—and not just any pills but fentanyl pills, any one of which could have proven lethal—to the CS even though he believed that the pills were destined to be delivered to thousands of young concertgoers. More troubling still, the defendant kept some of those pills (along with heroin and, as discussed below, a loaded firearm) in a home where his family and a child resided.

Exacerbating the dangers that his conduct posed to community members and even his own family, the defendant kept a firearm with his drug stash in his home. He kept the gun ready for use—It had an extended magazine and, at the time of its recovery, was loaded with 20 rounds of ammunition.

In sum, the defendant's crimes were gravely serious, and they demand a meaningful sentence.

*Second*, a term of imprisonment is necessary to promote respect for the law and specific deterrence. Although the defendant has no prior criminal convictions, his conduct suggests a need for personal deterrence. As noted above, the defendant's conduct is not consistent with that of a smalltime drug dealer—someone who, perhaps in an instance of aberrational conduct, tries their hand at selling their prescription pills to a friend, or weed at a party. Rather, the defendant had access to sizable quantities of particularly dangerous drugs. He even went so far as to acquire and keep a loaded firearm together with those drugs. That is, the defendant went to great lengths to operate a drug trafficking operation of an impressive scale, knowing full well the criminality of his conduct. And, tellingly, he ran that operation with savvy. For instance, the manner in which the defendant carried out the deal with the CS—showing the CS a sample before leaving and returning with the fuller order, concealed in a cooler—reveals his focus on avoiding detection. That behavior suggests a need to deter this particular defendant from committing similar crimes in the future, as does the defendant's professed motivation of financial hardship. The sentence in this case must convey to the defendant that his greed cannot justify pumping dangerous drugs into the community, with a loaded gun on hand.

Lastly, as to the defense's arguments concerning conditions at the Metropolitan Detention Center in Brooklyn (the "MDC"), (*see* Def. Br. at 7-8), although a number of courts in this District have in the past found that the conditions at MDC could justify a downward variance, the MDC has over recent months taken meaningful steps to address those issues and has steadily improved conditions, increasing staffing levels and addressing persistent medical issues. As Judge Caproni noted in December, "MDC is improving every day." 24 Mag. 4261 (UA) (VEC), Dec. 10, 2024, Tr. 15. And as Judge Caproni noted further in January of this year, "[T]o all of the: MDC is a horrible place, and it's awful, and they're going to be locked down forever, that's just not true anymore." 26 Cr. 767 (VEC), Jan. 16, 2025, Tr. 125). Judge Caproni added, "[T]he horror stories

from a year ago are just—it's not the facility. They have a lot more staff on. They've got a lot more medical staff, and they're doing the best they can." *Id.*

**D. Conclusion**

For the reasons set forth above, a sentence of 108 months' imprisonment would be sufficient, but not greater than necessary, to achieve the purposes of sentencing.

Respectfully submitted,<br>
JAY CLAYTON<br>
United States Attorney<br>
<br>
By:     /s/<br>
Benjamin M. Burkett<br>
Assistant United States Attorney<br>
Tel: (212) 637-2455

Cc:   Counsel of Record (ECF)